IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

MILES STOVALL,

                              Plaintiff,

v.

ASRC ENERGY SERVICES – HOUSTON
CONTRACTING COMPANY, INC.,

                              Defendant.

Case No. 3:18-cv-00259-TMB

**ORDER ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT
(DKT. 84)**

## I.   INTRODUCTION

The matter comes before the Court on Defendant ASRC Energy Services – Houston Contracting Company, Inc.'s ("AES-HCC") Motion for Summary Judgment (the "Motion").[1] *Pro se*[2] Plaintiff Miles Stovall ("Stovall") opposes the Motion (the "Opposition").[3]  The Motion has been fully briefed and is ready for decision without oral argument.[4]  For the following reasons the Motion at Docket 84 is **GRANTED**.

---

[1] Dkt. 84 (Motion).

[2] *Pro se* complaints and filings are held to less stringent standards than formal pleadings drafted by lawyers.  *See Byrd v. Phoenix Police Dep't*, 885 F.3d 639, 642–43 (9th Cir. 2018).  Nevertheless, Stovall remains obligated to conform filings to Local and Federal Civil Rules of Procedure.  *See King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987) ("Pro se litigants must follow the same rules of procedure that govern other litigants."), *overruled on other grounds by Lacey v. Maricopa County*, 693 F.3d 896, 925 (9th Cir. 2012); *see also* Fed. R. Civ. P. 8; Fed. R. Civ. P. 11; D. Alaska L. Civ. R. 1.1(a)(3).

[3] Dkts. 87 (First Response); 90 (Stovall's Motion to Amend & Revised Response); 96 (Text Order Accepting Motion to Amend Response); 98 (Stovall's Second Motion for Leave to Amend & Operative Response); 100 (Motion for Leave to File Supplemental Brief Opposing Summary Judgment); 106 (Text Order Accepting Second Motion to Amend Response); 107 (Order Denying Dkt. 100).

[4] *See* Dkts. 84; 98; 99 (Reply).

1

## II.    BACKGROUND

Plaintiff Miles Stovall, an African American man,[5] brings this case under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, alleging that AES-HCC unlawfully discriminated against him on the basis of his race; specifically, that AES-HCC made it "difficult for him to advance within the company and comply with the requirements of employment" and that AES-HCC "sabotaged" his "ability to properly do his job[.]"[6]  In Count 1, he alleges he suffered racial discrimination based on disparate treatment.[7]    In Count 2, he alleges he suffered racial discrimination based on retaliation; specifically, that AES-HCC retaliated against him when his "supervisors denied him the proper training" and when he "was unfairly terminated for speaking up to upper-management."[8]

### A.    The Parties

AES-HCC provides "oilfield support services on Alaska's remote North Slope and elsewhere, including by building and maintaining pipelines, refineries, ice roads, drilling pads, and other industrial facilities."[9]  "Until December 2016, AES-HCC operated an equipment shop [(the "Equipment Shop")] in Deadhorse, Alaska that provided heavy equipment-related services."[10]

---

[5] Dkt. 18 at ¶ 11 (Amended Complaint).

[6] *Id.* at ¶¶ 35–44.

[7] *Id.* at ¶¶ 35–39.

[8] *Id.* at ¶¶ 40–44.

[9] Dkt. 85 at ¶ 2 (Hall Decl.).

[10] *Id.* at ¶ 3.

2

Stovall was first hired by AES-HCC on April 9, 2015, to work as a journeyman tireman in the Equipment Shop, a full-time temporary position.[11] He was a union member affiliated with Teamsters Local 959.[12] AES-HCC terminated Stovall's employment on June 9, 2015, due to his inability to perform at the journeyman level, but he remained eligible to return in a different position.[13] Stovall was rehired from June 15 to July 27, 2015 for another temporary position driving heavy equipment to support a construction project. When the project was complete, the workforce was reduced and Stovall was laid off.[14] Stovall was hired for a third time on August 10, 2015, when he returned to the Equipment Shop after receiving the required training, and he was terminated on November 26, 2015.[15]

B. *Stovall's Third Tour with AES-HCC*

The parties agree that Stovall's claims arise solely from his November 26, 2015 termination, and not any prior actions by AES-HCC.[16] According to AES-HCC, Stovall's termination was the culmination of "multiple safety incidents and thousands of dollars of equipment damage, and [Stovall] refused to accept routine discipline (a one-day suspension with

---

[11] Dkts. 84-2 at 1 (Employee Information Record); 84-3 (Teamsters Referral Slip).

[12] Dkts. 84-2 at 1; 84-3.

[13] Dkt. 84-5 at 1 (Employment Status Report).

[14] Dkt. 84-6 at 1–2 (Employee Information Record and Email Record); 84-7 (Employment Status Report).

[15] Dkts. 84-9 (confirming that Stovall attended training); 86 at ¶ 5 (Howard Decl.); 84-20 (Employment Status Report) (noting that Stovall was "[t]erminated after causing damage to company equipment" and "[f]ailure to abide by company pol[i]cy by not performing 360 walk around.").

[16] Dkts. 84 at 14; 98 at 31 ("Furthermore Stovall asserts that he made it clear to the Defendant that his claim was based specifically on November 26, 2015 regarding discrimination (race) and retaliation under § 1981."); 84-23 at 13:22-14:12 (Stovall Dep. Tr.).

reinstatement) for his final safety incident."[17]  The events that gave way to Stovall's termination took place during his third and final period of employment with AES-HCC.

The Teamsters requested that AES-HCC hire Stovall for a third time in August 2015, to be part of the "AES/HCC Fleet Division" in Prudhoe Bay, which entailed picking up and delivering equipment, "[w]recker calls and [t]ire [w]ork, both light and heavy tires, truck, loader[,] etc."[18] The request indicated that Stovall needed to receive additional training, including "tire repair training [for] both heavy and light duty equipment[.]"[19]  Stovall received the required training from the Teamsters on August 13, 2015.[20]

On October 4, 2015, Stovall was transporting a bulldozer on a flatbed truck when he hit a bridge railing, damaging the first two axle rims and tires of the truck (the "October incident").[21] In a written reprimand signed by Stovall,  he acknowledged that the bulldozer was also improperly chained to the trailer bed, which could "potentially cause the unit to come off the trailer while traveling do[wn] the road."[22]  According to the Equipment Shop's policy, which was posted at the shop,[23] damage due to "negligence of [an] operator on any vehicle or equipment will result in

---

[17] Dkt. 84 at 5.

[18] Dkt. 84-8 (North Slope Craft Personnel Request).

[19] *Id.*

[20] Dkt. 84-9.

[21] Dkt. 84-14 at 1 (Oct. 5, 2015 Written Reprimand re: Accident); Dkt. 84-11 at 1 (Employee Statement re: October Accident).

[22] Dkt. 84-12 at 1 (Oct. 5, 2015 Written Reprimand re: Chains).

[23] Dkt. 85 at ¶ 9.

automatic suspension of employee."[24] Stovall provided a signed written statement where he described the underlying facts of the October incident that resulted in damage to the truck.[25]

On November 23, 2015, two separate employees filed Employee Statements alleging that Stovall was sleeping on the job in incidents that occurred on November 20 and 23, 2015 (the "sleeping incidents").[26] Stovall denied that he had been sleeping, however, the reports were documented in a written reprimand.[27]

On November 25, 2015, Stovall was involved in another incident (the "November incident").[28] Stovall reported that there were "two flat tires on the slider trailer" that he had been driving and that the tires "appeared to be off the rim and flat spotted."[29] Ryan Hall, Master Mechanic and one of Stovall's supervisors, stated that "it appeared that the tires had ruptured after being dragged over a roadway as a result of locked-up brakes."[30] Replacing the damaged tires cost about $2,000.[31]

On November 26, 2015, Stovall was called into the office with his Foreman Roy Turner, Superintendent Bruce Hanson, and Ryan Hall (collectively, "management").[32] Management

---

[24] *Id.*; Dkt. 84-13 (Notice).

[25] Dkt. 84-11 at 1.

[26] Dkts. 84-15 at 1 (Flowers Employee Statement), 2 (Nissen Employee Statement).

[27] Dkts. 85 at ¶ 10; 84-16 (Nov. 23, 2015 Written Reprimand re: Sleeping); *see also* Dkt. 98 at ¶ 9.

[28] Dkt. 84-17 (Written Reprimand re: November Incident).

[29] *Id.*; *see* Dkt. 18 at ¶ 26.

[30] Dkt. 85 at ¶ 11.

[31] *Id.*

[32] *See* Dkts. 18 at ¶ 28; 84 at 9–10; 85 at ¶ 13.

talked to Stovall about the incident and asked why he did not notice that the brakes were locked up.[33] The parties do not dispute that Stovall was required to do a 360-degree inspection of the truck prior to driving.[34] Stovall claims he performed the required 360-degree inspection, while management disagrees and asserts that Stovall would have noticed "broken indicator sticks" had he completed the inspection.[35] Stovall refused to sign the acknowledgment of the incident and denied fault for the tire damage.[36] Stovall stated in the meeting that management should have conducted an investigation of the November incident.[37] Stovall was told that he was being suspended for a day without pay because of the tire damage.[38] Stovall told management that he intended to "make[] a report to the Department of Labor," after being informed of his suspension.[39] Management called a safety employee, who escorted Stovall out of the meeting; the safety employee stated that even after the meeting Stovall refused to leave the premises.[40]

Management then called Terry Howard, who was responsible for the Equipment Shop and first hired Stovall in April 2015.[41] Management told Howard that Stovall refused to acknowledge

---

[33] Dkt. 85 at ¶ 13.

[34] *Id.*; Dkt. 89 at ¶ 5 (Stovall Decl.).

[35] Dkts. 89 at ¶ 5; 84 at 10; 85 at ¶ 13.

[36] Dkts. 85 at ¶ 14; 89 at ¶ 3 (stating that management's accusations were "conclusory" and that he (Stovall) "unknowingly dragged" the tires).

[37] Dkts. 85 at ¶ 14; 89 at ¶ 4.

[38] Dkts. 85 at ¶ 14; 89 at ¶ 7.

[39] *See* Dkts. 85 at ¶ 14; 89 at ¶ 7 ("I was not made aware of the suspension until after I returned to the office challenging the fact that they had not conducted the required investigation[.]").

[40] Dkt. 85 at ¶ 14. Stovall states that "Hall gave me permission to leave the office[,]" suggesting he voluntarily left the meeting. Dkt. 89 at ¶ 6.

[41] Dkt. 86 at ¶ 3 (Howard Decl.).

6

the written reprimand or suspension and refused to leave the Equipment Shop premises.[42] Howard terminated Stovall due to Stovall's insubordination, the November incident, and prior performance issues.[43] Howard states that he "was not aware that [Stovall] had mentioned discrimination to a safety employee earlier that day, or that he had said he might report his suspension to the Department of Labor."[44] Hall was also unaware of any statements made by Stovall to the safety employee until after Stovall filed the complaint in this case.[45] Subsequent to his termination, Stovall filed complaints with the National Labor Relations Board and the Alaska Commission for Human Rights, which, after investigation, did not result in any action against AES-HCC.[46]

### C. AES-HCC's Motion for Summary Judgment

AES-HCC moves for summary judgment on both of Stovall's claims, arguing that he "cannot meet his initial burden of presenting evidence to support a prima facie case of discrimination or retaliation."[47] And, even if he could, "it is undisputed that AES-HCC had legitimate, non-discriminatory and non-retaliatory reasons for suspending and terminating" Stovall.[48] Additionally, AES-HCC argues that Stovall does not point to any evidence that suggests AES-HCC's reasons for terminating him were pretextual.[49]

---

[42] *Id.* at ¶ 5.

[43] *Id.*

[44] *Id.* at ¶ 6.

[45] Dkt. 85 at ¶ 14.

[46] *See* Dkts. 84-21 (Ltr. to Stovall re: NLRB Investigation); 84-22 (Ltr. to Stovall re: Alaska Commission for Human Rights Determination).

[47] Dkt. 84 at 15.

[48] *Id.*

[49] *Id.*

### 1. Race-Based Disparate Treatment Claim under § 1981

Stovall's first claim is that he was unlawfully terminated by AES-HCC on account of his race.[50]  AES-HCC argues that Stovall cannot establish that he was qualified and performing satisfactorily because even though he received additional training, the "multiple, well documented safety incidents within months of his rehire demonstrate that his training was inadequate and that he remained unqualified."[51]  AES-HCC points to the October and November incidents as evidence that Stovall was not performing well and notes that "it was unheard-of for a single employee to be involved in multiple safety incidents in just two months."[52]  Furthermore, AES-HCC argues that Stovall cannot establish that "individuals not in his protected class committed similar misconduct and received lesser discipline."[53]  It states that AES-HCC applied its policies "uniformly, regardless of race" and, as Stovall testified, "there were multiple non-African American employees of the Equipment Shop who, like him, received write-ups or were suspended for causing damage."[54]  AES-HCC argues that Stovall's first claim must fail.

### 2. Retaliation Claim under § 1981

Stovall's second claim is that AES-HCC retaliated against him after he threatened to assert certain legal claims.[55]  AES-HCC argues that Stovall's claim must fail because Stovall cannot establish that he "engaged in a protected activity" or that a "causal link exists between the protected

---

[50] Dkt. 18 at ¶¶ 35-39.

[51] *Id.* at 16.

[52] *Id.*

[53] *Id.* at 16–17.

[54] *Id.* at 18 (citing Dkt. 84-23 at 126:23-129:11).

[55] Dkt. 18 at ¶¶ 40-44.

activity and the adverse action."[56]  At his deposition, Stovall described two alleged protected activities: (1) when management told Stovall on November 26, 2015, that he would be suspended without pay and Stovall threatened to complain to the Department of Labor; and (2) when he refused to go to his room or leave the premises as instructed by a safety employee, and asserted to the safety employee that he would file a complaint for prejudice and discrimination.[57]  Stovall later asserted a third basis for his retaliation claim, that on October 16, 2015, he called Howard and "reported that he was not receiving enough work assignments."[58]

AES-HCC argues that none of these events qualify as protected activities because "he did not communicate to AES-HCC any opposition to race-based employment practices."[59]  Even if he did engage in protected activities, AES-HCC argues that there "is no evidence that the activity caused his suspension or termination."[60]  Stovall's statements on November 26, 2015, were made *after* he was suspended, so there is no way for them to have caused his suspension.[61]  As to Stovall's termination, AES-HCC asserts that Howard "did not know about either statement when he made the decision to terminate" Stovall and that Howard was not at the Equipment Shop at the time.[62]  Since Howard was not aware of Stovall's comments, there is no way for Stovall's

---

[56] Dkt. 84 at 19 (internal quotation marks omitted).

[57] *Id.* at 20.

[58] *Id.* at 21.

[59] *Id.* at 20.

[60] *Id.* at 21.

[61] *Id.* at 22.

[62] *Id.*

comments to have caused Howard to terminate him.[63]   AES-HCC similarly argues that the

October 16, 2015 call to Howard was before Stovall's "multiple safety violations" and that these

intervening circumstances "cannot show that [Stovall's] October 16 complaint caused AES-HCC

decision to suspend and terminate him."[64]

### 3.   AES-HCC's States that It Had Legitimate Reasons to Suspend and Terminate Stovall

AES-HCC asserts that it had legitimate reasons to suspend and terminate Stovall.[65]   Even

after Stovall obtained additional training, within "just three weeks of on-duty time, [] Stovall drove

a vehicle into a bridge, causing significant damage; was discovered to have unsafely chained a

bulldozer to a trailer; was reported sleeping on the job on two separate occasions by two different

employees; and dragged two trailer tires (worth approximately $2,000) flat on a routine equipment

delivery run."[66]   Even if Stovall denies responsibility for any of the incidents, AES-HCC notes

that it is not disputed that they occurred.[67]   AES-HCC states that the Equipment Shop has a policy

"requiring suspension for equipment damage" and Stovall's suspension was consistent with this

policy.[68]   AES-HCC concludes by arguing that Stovall has not presented any "specific, substantial

---

[63] *Id.*

[64] *Id.* at 23.

[65] *Id.*

[66] *Id.* at 23–24.

[67] *Id.* at 24.

[68] *Id.*

evidence that creates a triable issue of fact" as to whether the reasons for his termination were pretextual, thus, his claims must fail.[69]

## B. Stovall's Opposition

In his Opposition, Stovall contends that his claims can prevail past summary judgment and that the Court should deny the Motion.[70] He states that he "firmly believes that the discriminatory and retaliatory actions that caused him to be the recipient of multiple materially adverse actions on [November 26, 2015], were intentionally done with animus and malice."[71]

### 1. Race-Based Disparate Treatment Claim under § 1981

Stovall argues that he can establish a prima facie case of discrimination.[72] Responding to AES-HCC, he argues that he was qualified for his position since he had "[two] years of cold weather commercial driving experience" and "met [AES-HCC's] requirements[.]"[73] He denies causing the November incident and states that he complied with AES-HCC's protocols for reporting damaged equipment.[74] Stovall further argues that he was "subjected to unlawful discriminatory treatment" when management did not conduct a mandatory incident review regarding damaged vehicle equipment that would have precluded Stovall from any materially

---

[69] *Id.* at 25.

[70] Dkt. 98 at 19.

[71] *Id.*

[72] *Id.* at 31.

[73] *Id.* at 33.

[74] *Id.* at 33–34.

adverse actions."[75]  Stovall also states that AES-HCC's failure to conduct an adequate "incident review" could be evidence of a pretext.[76]

As to Stovall's argument that he was subjected to disparate treatment, he argues that Hall's explanation for Stovall's suspension are in conflict; namely, that Hall first said that he was suspending Stovall due to an "outburst[,]" but in Hall's declaration he states that Stovall's suspension was "for damaging tires based on negligence[.]"[77]  Stovall asserts that "Hall frequently fraternized with other hourly employees at the shop, by hanging out with them and smoking" and that Hall did not reprimand one of his "smoking buddies" after "he failed to repair an engine properly causing further damage[.]"[78]

2.  Retaliation Claim under § 1981

Stovall argues that he engaged in protected activity "by communicating his intent to file a complaint with the Department of Labor[.]"[79]  He argues that "approximately thirty minutes after he participated in a protected activity . . . Hall influenced Howard's decision to terminate him by making false and conclusory statements to Howard[.]"[80]  Stovall argues that Howard "should not have taken the subordinates['] disparaging claims at face-value" because Stovall "filed a complaint against them a few weeks earlier[.]"[81]  Hall's influence on Howard is referred to Stovall as the

---

[75] *Id.* at 35.

[76] *Id.* at 36.

[77] *Id.* at 40.

[78] *Id.*

[79] *Id.* at 43.

[80] *Id.* at 45.

[81] *Id.* at 46.

"cat's paw" theory, which "refers to a situation in which a biased subordinate, who lacks decision-making power, influences the unbiased decision-maker to make an adverse decision, thereby hiding the subordinate's [retaliatory] intent."[82]  To the extent Stovall was suspended based on an outburst or insubordination, Stovall argues that he was "provoked" due to "speculative and conclusory accusations" given by Hall during the "unexpected vague reprimand[.]"[83]  The timing of his termination and Hall's inducement of Howard's decision show retaliatory motive, Stovall asserts.[84]  Stovall acknowledges that Howard was not told about Stovall's statements to Hall and others threatening to file an action with the Department of Labor.[85]  Stovall states that Hall had been the "main source of Stovall's issues" at the Equipment Shop, which contributed to Stovall's "negative responses[.]"[86]  Stovall further alleges that the sleeping incidents were false and that the write-ups for the sleeping incidents were "done of Hall's own personal spite" against Stovall.[87]

### C.  AES-HCC's Reply

AES-HCC filed a reply reiterating many of its arguments in the Motion.  It argues that Stovall "cannot escape from the fact that he *never mentioned race* in his November 26, 2015 statement" and that "there is no genuine dispute that he did not engage in protected activity[.]"[88]

---

[82] *Id.* at 44 (quoting *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 586 n.5 (6th Cir. 2009) (internal quotations omitted)).

[83] *Id.* at 48–49.

[84] *Id.* at 52.

[85] *Id.*

[86] *Id.* at 49.

[87] *Id.* at 51.

[88] Dkt. 99 at 11.

AES-HCC disputes Stovall's "cat's paw" theory, arguing that Hall "made no antagonistic comments or other demonstration of retaliatory animus" between Stovall's statement about the Department of Labor and Howard's decision to terminate Stovall.[89]  As to Stovall's repeated assertions that AES-HCC did not conduct an appropriate investigation, AES-HCC argues that "Stovall presents no evidence of a policy requiring any particular type of investigation."[90]  Finally, AES-HCC argues that the "inconsistent reasons" for Stovall's suspension and termination are not actually inconsistent—because there "is nothing inconsistent with disciplining an employee for both performance issues and insubordination."[91]  AES-HCC concludes by reiterating that Stovall had legitimate performance issues and that his allegations are conclusory and unsupported by the record.[92]

## III.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate where, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party,[93] "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[89] *Id.* at 12–13.

[90] *Id.* at 15.

[91] *Id.*

[92] *Id.* at 16–17.

[93] *Scott v. Harris*, 550 U.S. 372, 378 (2007).

14

law."[94]  Material facts are those which might affect the outcome of the case.[95]  A genuine issue of

material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

non-moving party."[96]  "There is no genuine issue of fact if, on the record taken as a whole, a

rational trier of fact could not find in favor of the party opposing the motion."[97]  A movant's burden

may be met by "'showing'—that is, pointing out to the district court—that there is an absence of

evidence to support the nonmoving party's case."[98]  Thus, "at the summary judgment stage the

judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial."[99]

Once a movant has met its initial burden, Rule 56(e) requires the nonmoving party to go

beyond the pleadings and identify facts which show a genuine issue for trial.[100]  Evidence

introduced in opposition to a summary judgment motion does not have to be the kind that would

be admissible at trial, but may be any type of evidence identified in Fed. R. Civ. P. 56(c).[101]

---

[94] Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Jensinger v. Nev. F. Credit Union*, 24 F.3d 1127, 1130–31 (9th Cir. 1994).

[95] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

[96] *Id.* at 248.

[97] *Mills v. Wood*, No. 4:10-CV-00033-RRB, 2015 WL 2100849, at *1 (D. Alaska May 6, 2015), *aff'd in part*, 726 F. App'x 631 (9th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[98] *Celotex Corp.*, 477 U.S. at 325.

[99] *Anderson*, 477 U.S. at 249.

[100] *Celotex Corp.*, 477 U.S. at 324.

[101] *See, e.g.*, *id.* at 323–24; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

15

However, "conclusory assertions are wholly insufficient to sustain either the defendants' burden or the district court's grant of summary judgment."[102] "A party opposing a summary judgment motion must produce '*specific* facts showing that there remains a genuine factual issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed."[103]

B. *Section 1981*

Stovall brings both of his claims under § 1981. Section 1981 provides that

[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.][104]

The statute defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."[105] To state a claim under § 1981, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally

---

[102] *Walker v. Sumner*, 917 F.2d 382, 387 (9th Cir. 1990); *see also Hilsinger v. Enerco Grp., Inc.*, No. 3:13-cv-00003-TMB, 2014 WL 12569381, at *2 (D. Alaska Sept. 3, 2014); *Mills v. Wood*, 2015 WL 2100849, at *1 (citing *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005); *Walker*, 917 F.2d at 387 ("In general, in ruling on a motion for summary judgment, a court may not weigh the evidence or judge the credibility of witnesses . . . . However, this rule does not apply to conclusory statements unsupported by underlying facts.")).

[103] *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (quoting *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979)).

[104] 42 U.S.C. § 1981.

[105] 42 U.S.C. § 1981(b).

protected right."[106]  It is not enough for a plaintiff to allege that race was only a "motivating factor" for their loss of a legally protected right.[107]

Although the Amended Complaint brings two counts under § 1981, Stovall in passing also alleges a violation of Title VII.[108]  "Courts generally analyze Title VII and Section 1981 claims the same, and 'facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim.'"[109]

### C.  McDonnell Douglas *Framework for Disparate Treatment Claim*

The framework established in *McDonnell Douglas Corp. v. Green* applies at the summary judgment stage and may be used by plaintiffs seeking relief under § 1981 or Title VII of the Civil Rights Act of 1964.[110]  Under *McDonnell Douglas*, first, a plaintiff may establish a prima facie case of discrimination.  To do so,

> a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff.[111]

---

[106] *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

[107] *Id.* at 1019 (rejecting the "motivating factor test" for § 1981 claims).

[108] Dkt. 18 at ¶ 37.

[109] *Oliver v. Iron Workers Union Local 229¸* No. 17-cv-1-LAB (MDD), 2019 WL 506600, at *3 (S.D. Cal. Feb 8, 2019) (quoting *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987)).

[110] 411 U.S. 792 (1973); *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028, 1028 n.5 (9th Cir. 2006); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004).

[111] *Cornwell*, 439 F.3d at 1028 (citing *McDonnell Douglas*, 411 U.S. at 802).

Second, if a plaintiff establishes a prima facie case of discrimination, *McDonnell Douglas* "creates a presumption that the plaintiff's employer undertook the challenged employment action because of the plaintiff's race."[112] Third, to rebut this presumption, the defendant must produce admissible evidence showing that the defendant undertook the challenged employment action for a "'legitimate, nondiscriminatory reason.'"[113] If the defendant does so, then "'the presumption of discrimination "drops out of the picture"' and the plaintiff may defeat summary judgment by satisfying the usual standard of proof required in civil cases[.]"[114] However, a plaintiff may "raise a triable issue of material fact as to whether the defendant's proffered reasons . . . [were] mere pretext for unlawful discrimination."[115] A plaintiff must present "substantial and specific evidence" to demonstrate that the defendant's reasons "were a pretext for racial discrimination."[116]

The *McDonnell Douglas* framework is not the only means for showing unlawful discrimination.[117] Instead, a plaintiff "may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason" motivated the employer.[118]

---

[112] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

[113] *Id.*

[114] *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

[115] *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010); *see Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017).

[116] *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 664 (9th Cir. 2002).

[117] *Reynaga*, 847 F.3d at 691.

[118] *Id.*

*D. Retaliation Claim*

The Ninth Circuit uses the same standard to evaluate claims of retaliation under both § 1981 and Title VII claims.[119] "To establish a prima facie case of retaliation, a plaintiff must prove (1) [he] engaged in a protected activity; (2) [he] suffered an adverse employment action; and (3) there was a causal connection between the two."[120] If established, the "burden shifts to the defendant to set forth a legitimate, non-retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show that the stated reasons were a pretext for retaliation."[121] A plaintiff "can show pretext in two ways—either directly by persuading the court that a discriminatory (retaliatory) reason more likely motivated [the employer], or indirectly by showing that [the employer's] proffered explanation is unworthy of credence."[122]

## IV.    ANALYSIS

Stovall has not established a "genuine dispute as to any material fact" in this case and thus the Motion is **GRANTED** as to Stovall's two claims in the Amended Complaint. Stovall fails to show a prima facie case of discrimination or retaliation under *McDonnell Douglas* or otherwise, and even if he were able to, AES-HCC had legitimate, nondiscriminatory reasons for suspending

---

[119] *See Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800–01 (9th Cir. 2003) (using Title VII framework to analyze retaliation claim under § 1981); *Williams v. Tucson Unified Sch. Dist.*, 316 F. App' 563, 564 (9th Cir. Dec. 4, 2008) (mem. op.) ("Retaliation claims under Title VII and § 1981 share identical legal standards.").

[120] *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008).

[121] *Id.*

[122] *Holmes v. Tenderloin Hous. Clinic, Inc.*, No. C 09–5781 PJH, 2011 WL 2843729, at *8 (N.D. Cal. July 18, 2011) (citing *Tex. Dep't of Comy. Affs. v. Burdine,* 450 U.S. 248 (1981)).

19

and terminating Stovall. Stovall also fails to establish that "but for race[,]" he would not have been suspended or terminated.[123]

### A. Race-Based Disparate Treatment Claim under § 1981

Stovall has not established a genuine dispute of any material fact regarding his alleged race discrimination on the basis of disparate treatment. Stovall does not establish a prima facie case of discrimination, and, even if he did, AES-HCC has produced evidence showing that it had "'legitimate, nondiscriminatory reason[s]'" for Stovall's suspension and termination that were not pretextual.[124]

1. Stovall Does Not Establish a Prima Facie Case of Discrimination under *McDonnell Douglas*.

The parties agree that Stovall is a member of a protected class and that he suffered an adverse employment action, the first and third prongs of the *McDonnell Douglas* framework.[125] The parties differ as to the second and fourth prongs, which ask whether Stovall was qualified for the job and performing satisfactorily and whether he was treated differently from similarly situated employees not in his protected class.[126] The Court finds that there is no genuine dispute of material fact as to whether Stovall was performing satisfactorily or treated differently from similarly situated employees.[127]

---

[123] *See Comcast Corp*, 140 S. Ct. at 1019.

[124] *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802).

[125] *See* Dkts. 84 at 15; 98 at 32.

[126] *See Cornwell*, 439 F.3d at 1028 (citing *McDonnell Douglas*, 411 U.S. at 802).

[127] To the extent AES-HCC argues that Stovall was unqualified when he was re-hired in August 2015 because his training was inadequate, its argument is not persuasive. Stovall's performance after being re-hired does not have any bearing on whether he was qualified for the position in August 2015. Stovall also raises legitimate arguments that he *was* qualified in August 2015 by

AES-HCC argues that Stovall was unqualified for the job and did not perform satisfactorily, primarily relying on the October, November and sleeping incidents.[128]  AES-HCC argues that "fail[ing] to properly secure a bulldozer[,]" "[running] his vehicle into a bridge[,]" and "failing to ensure that the tires on the trailer he was pulling were rotating properly" are all evidence of his poor performance on the job.[129]  Stovall disputes that he was at fault for any of the aforementioned incidents, but does not dispute that they occurred.[130]

At the prima facie stage, the threshold to show that Stovall was qualified and performing satisfactorily under *McDonnell Douglas* is "minimal"; nevertheless, Stovall cannot meet it here.[131]  There is no dispute that Stovall was involved in the October and November incidents that resulted in substantial damage to the equipment Stovall was operating.  The reports of Stovall sleeping on the job also inform whether Stovall was performing satisfactorily.  Stovall's denial of fault for the sleeping incidents, with no supporting evidence other than his own bare allegations,[132] does not create a genuine dispute of material fact as to whether he was qualified and performing

---

virtue of his experience and training. *See* Dkt. 98 at 33.  However, Stovall has not put forward any evidence beyond his own statements that he was performing satisfactorily.

[128] *See* Dkt. 84 at 16.

[129] *Id.*

[130] *See* Dkts. 89 at ¶ 20 (Hall induced employees to file false statements accusing Stovall of sleeping on the job); *id.* at 1–2 ¶ 3 (November incident not Stovall's fault); 84-23 at 26 2:9 (October incident not Stovall's fault).

[131] *Aragon*, 292 F.3d at 660.

[132] The Court has considered Stovall's statements in analyzing Stovall's case under *McDonnell Douglas*, but does not find that they establish a genuine dispute of material fact.

satisfactorily.[133]  AES-HCC also submitted a declaration from Hall, in which he states "[s]afety incidents were unusual at the Equipment Shop, and it was unheard of for a single employee to be involved in multiple safety incidents within a span of two months."[134]  Stovall provides no argument or evidence addressing Hall's assertion that it was "unheard of" for an employee to be involved in "multiple safety incidents" in such a short time frame.  Based on the foregoing, there is no dispute of material fact as to whether Stovall was performing satisfactorily prior to his suspension and termination.

Moving to the fourth *McDonnell Douglas* prong, the Court considers whether AES-HCC "treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff."[135]  AES-HCC argues that "there is no evidence that AES-HCC treated [] Stovall differently from non-African American employees with similar performance and behavior issues."[136]  AES-HCC also points to Stovall's deposition testimony, where Stovall states that he was aware of other employees having gotten suspended or fired.[137]  Stovall alleges that Hall treated his "smoking buddies" more leniently and that the individuals who

---

[133] *See* Dkt. 98 at 33–34 (citing Stovall Decl. as the basis for establishing his satisfactory performance).  Stovall implies that there may have been exculpatory evidence available, but that AES-HCC disposed of the relevant documents prior to discovery in this case.  Dkt. 89 at ¶¶ 16–17.  To the extent Stovall believes AES-HCC committed a discovery violation, summary judgment is not the appropriate avenue for such argument.

[134] Dkt. 85 ¶ 12.

[135] *Cornwell*, 439 F.3d at 1028 (citing *McDonnell Douglas*, 411 U.S. at 802).

[136] Dkt. 84 at 18.

[137] *Id.*; *see also* 84-23 at 128:9-25.

alleged Stovall was sleeping on the job were friends with Hall.[138]  Stovall also alleges that he "witnessed Hall not reprimand one of the mechanics that Hall frequently visited and smoked with, after the mechanic left metal debris in one of the piston chambers causing the engine to fail a second time."[139]  Another employee "failed to repair a customer's light duty truck" and Hall did not discipline him.[140]  In his Opposition, Stovall cites exclusively to his declaration to substantiate his claim that Hall was more lenient on his "smoking buddies[.]"[141]

Stovall's argument as to the fourth prong of the *McDonnell Douglas* analysis fails.  Stovall gives a cursory summary of two incidents where one mechanic "left metal debris in one of the piston chambers causing the engine to fail" and another "failed to repair a customer's light duty truck[.]"[142]  Stovall provides no other details about those employees' backgrounds, disciplinary histories, the severity of their incidents, or whether they are analogous to the incidents for which Stovall was reprimanded.  Stovall's deposition testimony also establishes that management did, in fact, reprimand employees who damaged equipment or made incorrect repairs:

Q: Did anyone get upset about the scratching of the equipment?

A: I believe they got written up.  I believe they got written up.  I'm not sure about that.

***

---

[138] Dkt. 89 at ¶ 8 (alleging that Hall was friends with the individuals who accused him of sleeping on the job and implying that he may have tolerated their "false statement[s]" to "paint[] a negative picture of poor job performance to Howard").

[139] *Id.*

[140] *Id.*

[141] Dkt. 98 at 40.

[142] Dkt. 89 at ¶ 8.

Q: Are you aware of any other employees at the equipment shop that did get suspended for any reason?

A: Yes. Yes, I am.

Q: Who and what was it for?

A: One guy . . . got either let go or suspended, because he didn't repair the engine correctly on a vehicle. Another one was ordering parts, and he wasn't repairing specific parts. He was ordering entire kits and just replacing the entire kit instead of one part. And he was also failing to make proper repairs. So it – yeah, it always seemed – every time I saw anybody disgruntled, it always had to do with, "Oh, great, I just got written up for that vehicle that just got sent back. The customer said it wasn't fixed, you know." So it was always something to do with the engine or something like that.[143]

Stovall's own statements acknowledge that disciplinary action was widespread, even for more minor infractions.

Nothing in the record raises a triable issue of fact as to whether Stovall was treated different because of his race. First, the two incidents described by Stovall in a cursory manner are dissimilar. "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."[144] That is not the case here. Leaving debris in an engine or failing to repair a truck properly are not similar to Stovall's multiple safety incidents including driving into a bridge,[145] allegedly sleeping on the job on multiple occasions,[146] and failing to inspect equipment, which resulted in dragging flat tires that appeared to be off the rim.[147] It is also unclear whether the employees discussed by

---

[143] Dkt. 84-23 at 128:9-129:8.

[144] *Vasquez v. City of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

[145] Dkt. 84-14.

[146] Dkt. 84-16.

[147] Dkt. 84-17.

Stovall have similar job responsibilities, as the alleged incidents escaping discipline were mechanical repairs as opposed to Stovall's operator error.

Second, there is no evidence in the record that Stovall was treated less favorably because of his race. Stovall states that he was the only African American employed at the Equipment Shop between April and November 2015, meaning his co-workers would have not been members of his protected class during his period of employment.[148] It follows, then, that all of the disciplinary actions taken by management against *other* employees during this time would have been actions against non-African American employees. Stovall acknowledges that other non-African American employees were reprimanded, and even "let go" too.[149] Third, there is no dispute that the Equipment Shop policy is to suspend employees who cause damage "due to negligence of [an] operator" or that Stovall was on notice of this publicly-posted policy.[150] Stovall points to no evidence of other operators like him (as opposed to mechanics) who caused damage to equipment or vehicles and were not suspended. Stovall cannot establish the fourth prong of the *McDonnell Douglas* analysis. Stovall also does otherwise not raise any additional direct or circumstantial evidence that would establish a prima facie case of discrimination.

2. <u>AES-HCC Had Legitimate Reasons to Suspend and Terminate Stovall</u>

Even if Stovall were able to establish a prima facie case of discrimination under *McDonnell Douglas*, Stovall's claim for disparate treatment under § 1981 or Title VII would fail because AES-HCC had legitimate reasons to suspend and terminate him. As discussed, Stovall was involved in

---

[148] Dkt. 89 at ¶ 2.

[149] *See supra* n.143.

[150] Dkts. 84-13 (HCC Shop Policy Notice); 85 at ¶ 9 (policy was "clearly posted").

multiple safety incidents in a short period of time, including driving into a bridge,[151] allegedly sleeping on the job on multiple occasions,[152] and dragging flat tires that appeared to be off the rim.[153] In addition, it is undisputed that Stovall refused to accept his suspension on November 26, 2015, or return to his room after management ordered him to leave the premises.[154] Any one of these incidents could arguably be an independent legitimate basis for disciplinary action, and collectively AES-HCC had a legitimate non-discriminatory basis to suspend and terminate Stovall.[155]

---

[151] Dkt. 84-14.

[152] Dkt. 84-16.

[153] Dkt. 84-17.

[154] *See* Dkts. 89 at ¶ 21 (citing video evidence of Stovall opposing suspension); 85 at ¶ 15 (Hall's statement that Stovall refused to leave the premises "despite multiple orders to do so").

[155] *See, e.g.*, *Nguyen v. Dep't of Navy*, 412 Fed. Appx. 926, 929 (9th Cir. Jan. 18, 2011) (mem. op.) (Legitimate reasons for disciplining and removing an employee included "substandard communications skills, low performance ratings and complaints from her customers, poor attendance and habitual tardiness, misuse of the government telephones and computers, and her admission that she took original copies of faxes addressed to her colleagues without their knowledge."); *Willie v. Nevada ex rel. Nev. Dep't of Public Safety*, 234 F.. App'x 449, 451 (9th Cir. May 17, 2007) (mem. op.) (Legitimate reasons for employer's adverse action include "insubordination, use of profanity, falsification of time sheets, improperly charging tires to the state, attempting to cover up the tire charges, and breaching confidentiality with a witness in [e]mployer's investigation of his actions."); *Brown v. Dignity Health*, No. CV-18-03418-PHX-JJT, 2020 WL 3403088, at *8 (D. Ariz. June 19, 2020) (Sleeping on the job was a legitimate reason for termination.); *Holmes*, No. C 09–5781 PJH, 2011 WL 2843729, at *7 (A reasonable basis for termination included violating the employer's Code of Professional Conduct.); *Surrell*, 518 F.3d at 1108 (Appearing at work in an impaired state and testing positive for illicit drugs is a legitimate reason for employer's adverse action.); *Farier v. City of Mesa*, No. CV–07–1407–PHX–DGC, 2009 WL 1394979, at *5 (D. Ariz. May 19, 2009), *aff'd*, 384 F. App'x 683 (9th Cir. 2010) (Failing an interview was legitimate reason for denying plaintiff a promotion.).

26

3. AES-HCC's Reasons for Suspension and Termination were Not Pretextual

Stovall can still prevail on a claim for disparate treatment based on race if he can show that AES-HCC's reasons for suspending and terminating him were pretextual. However, he has not "raise[d] a triable issue of material fact as to whether the defendant's proffered reasons . . . [were] mere pretext for unlawful discrimination."[156] Stovall's main argument that AES-HCC's reasons were pretextual is that management offered "inconsistent reasons" for their suspension and termination.[157] Specifically, Stovall argues that Hall's written statement on November 26, 2015, states that Stovall was suspended for an "outburst" and that Hall did not mention the damaged tires as a basis for the suspension.[158] Later, Hall stated that the damaged tires were the reason for Stovall's suspension.[159] Stovall also reiterates that AES-HCC should have conducted a "required incident review[.]"[160] AES-HCC responds by arguing that "disciplining an employee for both performance issues and insubordination" is not inconsistent.[161]

Stovall is correct in that Hall's declaration states that Stovall was suspended "because of the tire damage[.]"[162] The reprimand for the November incident indicates that Stovall had two flat tires and that they "appeared to be off the rim[.]"[163] Hanson, who was present at the November 26,

---

[156] *Hawn*, 615 F.3d at 1155.

[157] Dkt. 98 at 36.

[158] *Id.*

[159] *Id.* (citing Dkt. 85).

[160] *Id.*

[161] Dkt. 99 at 15.

[162] Dkt. 85 at ¶ 14.

[163] Dkt. 84-17.

2015 meeting, also indicated that Hall told Stovall that he was being sent to his room because of the shop policy for equipment damage.[164]  However, Hall's statement following the events of November 26, 2015, states that Stovall was sent "home for the day for his outburst."[165]  Howard "instructed onsite management to terminate" Stovall after learning that Stovall "refused to accept the write-up or the suspension" and in light of "all of his other performance issues[.]"[166]

There were multiple grounds for management's disciplinary action on November 26, 2015, none of which Stovall can show were pretextual.  Stovall does not dispute that his vehicle was damaged in the November incident and he does not dispute that there was some level of insubordination through his actions on November 26, 2015.[167]  Stovall was liable for a suspension due to the vehicle damage, according to noticed shop policy, and also liable for potential suspension based on his insubordinate behavior in refusing to accept the reprimand.  Hall's statements all arise out of the same set of facts: Stovall was party to an incident involving damaged equipment, Stovall was called to a meeting with Hall and others, Stovall refused to acknowledge the reprimand for the incident, and Stovall was suspended due to some combination of the equipment damage and insubordination.  AES-HCC had a legitimate basis for its actions and there is no indication its reasons for suspension or termination were pretextual.  Stovall's argument that AES-HCC should have conducted a more thorough review is also unavailing.[168]  At this stage of the *McDonnell Douglas* analysis, since AES-HCC articulated a legitimate non-discriminatory

---

[164] Dkt. 84-18 at 5 (Hanson Statement).

[165] Dkt. 84-18 at 1 (Hall's Employee Statement).

[166] Dkt. 86 at ¶ 5.

[167] *See* Dkt. 89 at ¶¶ 21, 23.

[168] *See, e.g.*, Dkt. 84-18 at 6 (noting that an investigation was completed prior to the reprimand).

28

basis for Stovall's suspension and termination, the burden is on Stovall to show pretext.[169]   The

Court concludes that Stovall has not met his burden.   Accordingly, the Motion as to Count 1 of

Stovall's Amended Complaint is **GRANTED**.

B.        *Retaliation Claim under § 1981*

Stovall's claim for retaliation under § 1981 similarly fails.   Retaliation claims are evaluated

under a burden-shifting framework that is a derivative of *McDonnell Douglas*.   Stovall may

establish a prima facie case of retaliation by showing that (1) "he engaged in a protected activity";

(2) "suffered an adverse employment action"; and (3) there was a "causal connection between the

two."[170]   If a prima facie case is established, then AES-HCC may set forth a "legitimate, non-

retaliatory reason for its actions" and if it does so, then Stovall may "produce evidence to show

that the stated reasons were a pretext for retaliation."[171]

Stovall cannot establish a prima facie case of retaliation because he cannot demonstrate

that there is a causal connection between his asserted protected activity and his suspension or

termination.[172]   Stovall's proffered "protected activities" include (1) his statement at the

November 26, 2015 meeting that he would file a complaint with the Department of Labor; (2) his

statement to the public safety employee that if he would file a complaint for prejudice and

---

[169] *Reynaga*, 847 F.3d at 693 (citation omitted).

[170] *Surrell*, 518 F.3d at 1108.

[171] *Id.*

[172] The Court assumes without deciding that Stovall engaged in a protected activity.  It finds that a prima facie case is not established, however, because Stovall cannot show causation, the third prong of the analysis.

discrimination if removed; and (3) his call to Howard on October 16, 2015, during which he complained that he was not receiving enough work assignments to meet his hour requirements.[173]

AES-HCC argues that Stovall cannot establish any casual connection between the November 26, 2015 statements and his suspension because his suspension happened before he made either statement.[174] As to Stovall's termination, AES-HCC argues that there is no causal link between Stovall's statements and his termination because "Howard did not know about either statement when he made the decision to terminate" Stovall.[175] As to the October 16, 2015 call to Howard, AES-HCC argues that the causal link is broken because since that date Stovall was involved in "multiple safety violations and refused to accept a routine suspension."[176]

In opposition, Stovall argues that Hall "influenced Howard's decision to terminate" Stovall by "making false and conclusory statements to Howard[.]"[177] Stovall argues that Howard should not have believed Hall's "disparaging claims" because "Stovall had just filed a complaint against [him] a few weeks earlier[.]"[178] Stovall's "cat's paw" theory is that Hall inappropriately and unfairly influenced Howard's decision to terminate Stovall.[179] AES-HCC disputes Stovall's "cat's

---

[173] *See* Dkts. 98 at 42–43; 89 at ¶ 7; 84-23 at 17:20-18:14 (noting that the protected activities included Stovall's statement to Hall, Hanson, and Turner that he would file a complaint with the Department of Labor and his oral statement to the safety officer that he would file a complaint for discrimination and prejudice); 84-23 at 45 (errata stating that he participated in a protected activity on October 16, 2015, when he filed a complaint with Howard).

[174] Dkt. 84 at 22.

[175] *Id.*

[176] *Id.* at 23.

[177] Dkt. 98 at 45.

[178] *Id.* at 46 (emphasis removed).

[179] *Id.* at 43.

paw" theory by arguing that Hall "made no antagonistic comments" in the time between Stovall's "statement regarding the Department of Labor and the decision to terminate his employment[.]"[180] Further, AES-HCC argues that Stovall "does not even explain what he thinks [] Hall falsely told [] Howard[.]"[181]

The Court finds that Stovall cannot establish a causal link between his proffered protected activities and his suspension or termination.  First, the Court agrees with AES-HCC that Stovall's statements on November 26, 2015, could not have influenced Hall's decision to suspend Stovall, since the suspension was issued prior to Stovall's statements.  The Court also agrees with AES-HCC that Stovall's statements to Howard on October 16, 2015, could not have influenced Hall's decision to suspend Stovall because Hall was not party to that conversation and the sleeping incidents and November incident all occurred after that conversation, which were significant and mitigate any causal connection.  Further, Howard does not recall speaking with Stovall on October 16, 2015, though states that "it's possible we spoke[.]"[182]  Stovall does not contest AES-HCC's argument in his Opposition, and instead relies on the "cat's paw" theory that Hall inappropriately influenced Howard's decision to terminate him.  Thus, Stovall has failed to establish a causal link between the proffered protected activities and Stovall's suspension.

Second, the Court finds that Stovall cannot establish a causal connection between any of his statements and Howard's decision to terminate Stovall.  Howard states that "[w]hen I made the decision to terminate [Stovall], I was not aware that he had mentioned discrimination to a safety

---

[180] Dkt. 99 at 13.

[181] *Id.*

[182] Dkt. 86 at ¶ 7.  Stovall also notes that his call to Howard on October 16, 2015 was not about discrimination.  Dkt. 98 at 49.

employee earlier that day, or that he had said he might report his suspension to the Department of Labor. Onsite management did not tell me about these statements."[183] Howard states that he based his termination decision on Stovall's refusal to accept the reprimand or suspension, and on Stovall's "other performance issues[.]"[184] Stovall does not dispute Howard's assertion that he was unaware of Stovall's proffered protected activities on November 26, 2015. Statements which Howard was not aware of could not have caused Howard's termination decision, and thus Stovall cannot establish a causal connection between the November 26, 2015 statements and his termination.

As to Stovall's "cat's paw theory," Stovall does not state with specificity which "false and conclusory statements" Hall made to Howard.[185] Stovall does not dispute that the October or November incidents occurred and does not deny the fact that he refused to acknowledge the reprimand or accept a suspension on November 26, 2015. Stovall only makes the conclusory assertion that Hall had a "malicious intent" to retaliate against Stovall.[186] Based on the record before it, Stovall has made no showing that Howard was susceptible or succumbed to Hall's unsubstantiated "malicious" agenda.[187] Accordingly, Stovall also fails to make any showing of causation as to his termination, and thus he cannot establish a prima facie case of retaliation.

---

[183] Dkt. 86 at ¶ 6.

[184] *Id.* at ¶ 5.

[185] *See* Dkt. 98 at 45; *Surrell*, 518 F.3d at 1108.

[186] Dkt. 98 at 46.

[187] The Court also notes that Howard in fact *re-hired* Stovall after his first termination. Dkt. 86 at ¶ 3. Further, Stovall does not allege Howard had any animus towards him.

Even if Stovall were able to establish a prima facie case of retaliation, his claim would still fail because AES-HCC had a "legitimate, non-retaliatory reason for its actions," namely, Stovall's multiple safety violations and his insubordinate behavior on November 26, 2015.[188] Additionally, for reasons the Court has already articulated, Stovall cannot establish that AES-HCC's reasons for termination were pretextual.[189] Accordingly, the Motion as to Count 2 of Stovall's Amended Complaint is **GRANTED**.

## V. CONCLUSION

Accordingly, for the above reasons, AES-HCC's Motion for Summary Judgment at Docket 84 is **GRANTED**. Stovall's claims against AES-HCC in Counts 1 and 2 of the Amended Complaint are **DISMISSED with prejudice**.

IT IS SO ORDERED.

Dated at Anchorage, Alaska, this 2nd day of August, 2021.

/s/ _Timothy M. Burgess_
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

---

[188] The Court incorporates its analysis from Section IV.A.2, discussing AES-HCC's legitimate reasons for suspending and terminating Stovall, in full.

[189] The Court incorporates its analysis from Section IV.A.3, addressing Stovall's arguments alleging AES-HCC's reasons were pretextual, in full.

33